UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DISTRICT COURT
CIVIL ACTION # 04-12511RGS

| | |
|---|---|
| John A. Baldi | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| Edward Barshak, Alice Richmond, Robert | ) |
| Muldoon, Jr., Anthony Massimiano, | ) |
| William Kennedy, III, Margaret Marshall, | ) |
| John Wall | ) |
| | ) |
|      Defendants | ) |
| | ) |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS**

The defendants, Edward Barshak , Alice Richmond , Robert Muldoon, Jr., Anthony Massimiano, William Kennedy III, Margaret Marshall, and John Wall respectfully request that, pursuant to Fed. R. Civ. P. 12(b)6, the court dismiss the plaintiff's complaint for failure to state a claim upon which relief can be granted.

**INTRODUCTION**

The plaintiff, John Baldi ("Baldi") is an individual seeking membership in the Massachusetts Bar. The defendants who are being sued in their individual capacities are: Chief Justice of the Supreme Judicial Court, Margaret Marshall ("Marshall"), Chairman of the Board of Bar Examiners ("BBE") Edward Barshak ("Barshak"), individual members of the BBE, Alice Richmond ("Richmond"), Robert Muldoon, Jr. ("Muldoon"), Anthony Massimiano ("Massimiano"), William Kennedy III ("Kennedy"), and BBE *pro bono* attorney, John Wall

1

("Wall"). This action stems from the BBE's refusal to forward Baldi's application to the Supreme Judicial Court ("SJC") without a thorough investigation into Baldi's character and fitness to practice law in the Commonwealth. This court should dismiss this action against all defendants because: 1) as a matter of law Baldi is not a member of a cognizable class subject to a discriminatory animus; and 2) the defendants qualify for judicial, quasi-judicial or prosecutorial immunity.

## SUMMARY OF THE COMPLAINT

Baldi has filed an eleven count complaint based on five statutes: a 42 U.S.C. § 1985(3) claim, against all defendants, alleging conspiracy to interfere with his civil rights by conspiring for the purpose of depriving his equal protection of the laws, a 42 U.S.C § 1985(2) claim, against all defendants, alleging conspiracy to interfere with his civil rights by obstructing due course of justice, four 42 U.S.C § 1986 actions, against all defendants; four 42 U.S.C. § 1983 claims, against all defendants, alleging violations of his First Amendment right to free speech, and to petition the government for a redress of grievances; and a 42 U.S.C. § 1988 action for attorney fees.

## SUMMARY OF THE ARGUMENT

Baldi's § 1985 claims should be dismissed because he is not a member of a cognizable class subject to discriminatory animus as required by statute. Accordingly, Baldi's § 1986 claims should also be dismissed because absent a claim under § 1985, a § 1986 claim cannot stand. Also, Baldi's § 1983 civil rights claim should be dismissed because: defendant Chief Justice Marshall qualifies for judicial immunity; defendants Barshak, Richmond, Muldoon, Massimiano and Kennedy, as members of the BBE, qualify for quasi-judicial immunity, and defendant John Wall qualifies for prosecutorial immunity. Accordingly, Baldi's § 1988 claim

2

for attorney fees should be dismissed because such a compensatory claim cannot stand against a judicial quasi-judicial or prosecutorial officer for an act or omission taken in the officer's official capacity.

## RELEVANT FACTS

Baldi is a recent graduate of the Massachusetts School of Law who was unsuccessful in his first attempt to pass the Massachusetts Bar examination in February 2003. (Baldi Complaint ("BC") ¶ 17) Baldi alleges that his failure to pass the exam was due to a poorly drafted essay question (BC ¶ 14, 15)

In May, 2003, Baldi petitioned defendant Barshak to review and re-score his essay question. (BC ¶ 18) When Barshak and the BBE declined, Baldi filed a petition for a Writ of Mandamus or Injunctive Relief with the Massachusetts Supreme Judicial Court. (BC ¶ 19) The Court denied Baldi's petition. (BC ¶ 19)

Although Baldi passed the July, 2003 Massachusetts Bar Exam, the BBE did not forward Baldi's application to the SJC because it had not concluded its investigation into his character and fitness to practice law. (BC ¶ 20-23) Upon learning of this delay, Baldi filed a petition for Declaratory Judgment and Injunctive Relief with the United States District Court on January 28, 2004 (BC ¶ 22) The BBE informed the district court of its character investigation. (BC ¶ 23) On, May 17, 2004 the court granted the BBE's motion to dismiss for lack of subject matter jurisdiction. (BC ¶ 24)

Baldi then filed for a subpoena to review his file held by the BBE. (BC ¶ 25) Upon receipt of his file, Baldi alleged that someone had marked his examination booklet with the letters "MSL", indicating the Massachusetts School of Law, and a statement that he had been rude to defendant Richmond. (BC ¶ 25)

On  May 23, 2004   Baldi then subpoenaed defendant Barshak for a deposition.  (BC ¶ 26)  Baldi maintains that he included travel payments and witness fees, which were not returned, with the subpoena.  (BC ¶¶ 26, 28)  Baldi alleges that defendant Barshak responded to his actions with a threatening letter urging him to withdraw the subpoena or it would be used against him in his application for bar admittance.  (BC ¶ 26)  When Baldi refused to do so, defendant Barshak filed a motion to quash the subpoena. (BC ¶ 26) Eventually, the subpoena was quashed.  (BC ¶ 27)  On  March 19,2004   Attorney John Wall submitted an investigative report on the character and fitness of Baldi  to the BBE which contained 16 pages of text and 50 exhibits. On June 29, 2004 a hearing was conducted by the BBE  and Baldi represented himself.   The BBE reviewed the evidence on the June 29th hearing and filed  its report and recommendations  with the SJC in March 4,  2005. In that report the BBE concluded that Baldi not be recommended for admission as an attorney.  In the Matter of John A. Baldi, Petitioner for Admission as an Attorney at Law, No. BA-159224 (Exhibit One)

ARGUMENT

Baldi has failed to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) because (I) he is not a member of a cognizable class subject to a race-based or otherwise discriminatory animus, and (II) the defendants qualify for judicial, quasi-judicial or prosecutorial  immunity.

I.      AS A MATTER OF LAW, BALDI'S CLAIMS MUST FAIL BECAUSE HE IS NOT A MEMBER OF A COGNIZABLE CLASS SUBJECT TO A DISCRIMINATORY ANIMUS.

Baldi alleges that as a graduate of an unaccredited law school he is a member of a cognizable class.  However, in order to state a claim under § 1985(3) a plaintiff must allege the existence of 1) a conspiracy, 2) a conspirational purpose to deprive a person or class of persons, directly or indirectly, of the equal protection of the laws or of equal privileges and immunities

under the laws, 3) an overt act in furtherance of the conspiracy; and 4) either (a) an injury to person or property, or (b) a deprivation of a constitutionally protected right or privilege.  Griffin v. Breckenridge, 403 U.S. 88, 102 (1971).

In Griffin, the Supreme Court advanced a fifth requirement by construing the statutory language referencing "equal protection" and "equal privileges and immunities under the laws" to indicate that a plaintiff may recover only when the conspirational conduct is the result of "some racial, or perhaps otherwise class-based, invidiously discriminatory animus."  Id. at 2  This rule applies regardless of whether the conspiracy is alleged to have involved public officials, private actors, or both.  Aulson v. Blanchard, 83 F.3d 1, 4 (1st Cir. Mass. 1996).

While there is no comprehensive set of rules for determining whether individuals constitute a cognizable class for purposes of § 1985(3), courts recognize that there are certain minimum requirements.  Id. at 5  For example, at a bare minimum, a class must be more than just a group of persons who bear the brunt of the same allegedly tortious behavior.  Creative Environments, Inc. v. Estabrook, 83 F.2d 822, 822 (1st Cir. 1982).  In Estabrook, the court rejected a plaintiff's claim alleging discrimination against a class of future homeowners when a municipal planning board rejected a proposed subdivision.  The court reasoned that a § 1985(3) claim was inappropriate where the proposed class was no more than "an undefined group of people with unknown income, racial, political and social characteristics." Id. at 834.

To be cognizable, a class must be distinct and recognizable by criteria other than a plaintiff's desire to engage in conduct disfavored by a defendant. Immutable characteristics qualify for protection.  For example, in determining the scope of § 1985(3), it is universally acknowledged that racial classes are protected.  Griffin v. Breckenridge, 403 U.S. at 102.  Also,

gender-based classes are recognized as groups that merit 1985(3) protection.  Libertad v. Welch, 53 F.3d 428, 449 (1st Cir. 1995)

However, the statute does not extend its protective reach to conspiracies motivated by bias towards others on  account of their economic views, status or activities. United Brothers of Carpenters v. Scott, 463 U.S. 825, 103 (1985).  The First Circuit has  held that a political "opposition group" was not a cognizable class for the purposes of § 1985(3) in Aulson v. Blanchard, 83 F.3d 1 (1st Cir. 1996).

Measured against this benchmark, the class to which Baldi purports to belong, a class of applicants who graduated from an unaccredited law school, is not a distinct, recognizable class pursuant to the requirements of § 1985(3).  While courts have recognized distinctive classes according to race, gender and political affiliation, the court has refused to extend § 1985(3) protections to plaintiffs who claim affiliation with an unidentified, unknown, non-distinct group of people.  Estabrook, 680 F.2d at 822.

In the present case, Baldi fails to establish a distinct cognizable class-based animus as the proposed class is an unspecified number of applicants who graduated from an unaccredited law school.  Also, nothing in his complaint indicates that the defendants treated him and other Massachusetts Law School graduates as a class.  In fact, far from establishing himself as a member of a class, Baldi singles himself out as being the *only* applicant, of all the July 2003 bar exam passers, to be denied admittance to the Massachusetts bar in December 2003. (Complaint ¶ 21

The companion clause to § 1985(3), § 1985(2), has two clauses: the first proscribes conspiracies to interfere with litigation in federal court; the second proscribes conspiracies to

obstruct the course of justice in state courts. <u>Kush v. Rutledge</u>, 460 U.S. 719, 722 (1983).   In his complaint, Baldi invokes the second clause regarding state courts.

To state a claim under § 1985(2), the same elements are required as under § 1985(3): 1) that the defendants conspired; 2) that the purpose of the conspiracy was to impede or hinder, or obstruct or defeat the due course of justice in a state or territory with the purposeful intent to deny a citizen equal protection of the law; 3) that the acts complained of were done under color of state law or authority; 4) and that the plaintiff was injured in his or her person or property or was deprived of having and exercising a right or privilege of a citizen of the United States by the act done in furtherance of the conspiracy.  <u>United Brotherhood of Carpenters and Joiners of America</u>, 463 U.S. 825 (1983).  Also, like § 1985(3), racial or class-based animus is required to establish a cause of action for conspiracy to interfere with the equal protection of the laws in state courts pursuant to the second clause of § 1985(2).  <u>Kush</u>, 460 U.S. at 722, n.3

Since Baldi cannot make a showing of a discriminatory class-based animus his claim under 42 U.S.C. § 1985(2) must fail for the same reasons as his claim fails under 42 U.S.C. § 1985(3).

Accordingly, without a basis for a claim under § 1985, no basis exists for Baldi's claims under 42 U.S.C. § 1986 in Counts II, V, VII, IX, XI.  <u>Hahn v. Sargeant</u>, 523 F.2d 461 (1st Cir. 1975).   A prerequisite for a claim under 42 U.S.C. § 1986, is the existence of a conspiracy actionable under § 1985.  <u>Canney v. City of Chelsea</u>, 925 F. Supp. 58, 68 (D. Mass. 1996). Claims failing to do so must be dismissed.

II. DEFENDANTS ARE ENTITLED TO JUDICIAL, QUASI-JUDICIAL OR PROSECUTORIAL  IMMUNITY FROM BALDI'S CLAIMS PURSUANT TO 42 U.S.C. § 1983.

7

The law is clear that absolute immunity attaches to judicial acts. Forrester v. White, 484 U.S. 219, 108 S.Ct. 538, 542, 98 L.Ed.2d 555 (1988). The analytical key for determining whether immunity attaches to certain acts is the nature of the function involved. Forrester at 219. Immunity attaches not only to judges, but to prosecutors, and certain "quasi-judicial" agency officials who perform functions similar to that of judges. Butz v. Economou, 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1977).

All named defendants to this action qualify for either judicial, quasi-judicial or prosecutorial immunity against Baldi's § 1983 claims. As Chief Justice of the SJC, defendant Marshall qualifies for judicial immunity. Defendants Barshak, Richmond, Muldoon, Massimiano, and Kennedy, qualify for quasi-judicial immunity because as members of the BBE, a branch of the SJC, they perform functions similar to those of judges in adjudicating bar applicant eligibility.[1]

Finally, as BBE retained counsel, defendant Wall qualifies for prosecutorial immunity because he functioned in a prosecutorial capacity by acting as the prosecutor at the June 29, 2004 hearing on the bar application of Mr. Baldi.

---

[1] See Ostrzenski M.D. v. Seigel M.D., 177 F.3d 245 (4th Cir. 1999) (rejecting reviewed physician's claim that his reviewing physician violated his due process rights because the reviewing physician was entitled to absolute quasi-judicial immunity); Hampton v. Tennesee Board of Law Examiners, 770 S.W.2d 755 (Ct. App. Tenn, 1989) (holding that Board of Law Examiners, individual members of the Board, and individual assistant to Board members were all judicially immune from liability to bar applicants who alleged that Supreme Court rules pertaining to bar exam were applied discriminatorily); Sparks v. Character and Fitness Committee of Kentucky, 859 F.2d 428 (6th Cir. 1988) (holding that Committee on Character and Fitness and its members, in denying application for admission to state bar, were "judicial acts" to which absolute immunity attached).

Recently, in a similar set of facts to the case at bar, the Massachusetts District Court granted quasi-judicial and prosecutorial immunity to certain members of the Board of Bar Overseers (BBO) and Bar Counsel named in their individual and professional capacities. Johnson v. Board of Bar Overseers, 324 F. Supp. 2d 276 (D. Mass. 2004). The plaintiff in Johnson was an attorney subject to disciplinary action brought against her by the BBO. *Inter alia*, she alleged conspiracy pursuant to s. 1985 amongst the members of the BBO who censored her objectionable website and violations of her civil rights pursuant to § 1983. Id. at 280.

The Johnson court analyzed the judicial and prosecutorial immunity of members of the BBO and their Bar Counsel who conducted an attorney discipline hearing pursuant to SJC Rule 4.01. In this hearing, findings of fact and legal conclusions were made leading to a recommendation of attorney discipline. In deciding immunity the Court adopted the three prong test used in Bettencourt v. Board of Registration in Medicine of the Commonwealth of Massachusetts, 904 F.2d 772 (1st Cir. Mass.1990)

This tests asks, first, does a board member decide facts, apply law and resolve disputes on the merits? Second, does a board member decide cases sufficiently controversial

that he would be subject to damages? Third, does a board member adjudicate disputes amidst

constitutional safeguards? Johnson v. Board of Bar Overseers, 324 F.Supp.2d at 287.

The court found that the BBO chair and hearing officer were performing a traditional

adjudicatory  function by determining whether to recommend Johnson for disciplinary sanctions after making factual and legal determinations. Id. at 281.  Bar counsel, however was not acting in a adjudicative role, since his role was to prosecute disciplinary proceedings before hearings.

Johnson v. Board of Bar Overseers, 324 F.Supp.2d at 287.

The court held that the BBO chair and special hearing officer, who conducted disciplinary proceedings, were entitled to absolute quasi-judicial immunity from liability; and counsel from the Massachusetts Office of Bar Counsel was entitled to absolute quasi-prosecutorial immunity from liability.  Johnson at 287,288.

In applying the Bettencourt  three prong  test to the case at bar  it is clear that a member of the BBE performs an adjudicatory function in deciding the eligibility and fitness of a bar applicant to practice law in the Commonwealth of Massachusetts.  Second, BBE members, in withholding approval of bar applicants,  have been the subject of litigation from  unsuccessful candidates.[2]  Third, a BBE member, like a judge, adjudicates disputes  pursuant to M.G.L. c.. 221 § 37 and S.J.C. Rule 3:01, §. 5 as appearing in 411 Mass. 1321 (1992) .  During these hearings, extrinsic evidence, such as character reference letters and other documentary evidence is permitted and encouraged so that a comprehensive analysis can be launched into the applicant's fitness. See Matter of Prager, 422 Mass. 86, 100 (1996).

Here, the  board  members of the BBE  were acting within the scope of their adjudicatory duties when they: 1) conducted an investigation into Baldi's fitness to practice law;

---

[2] See Corliss v. BBE, 437 Mass. 1023 (2002) (denying admittance to applicant with criminal history); Matter of Prager, 422 Mass. 86 (1996) (same); In the Matter of Application for Admission to the Bar of the Commonwealth, 378 Mass. 795 (1979) (denying admittance to applicant based on his used of judicial processes in a way inconsistent with the standard expected of a lawyer).

2) held a  hearing; and 3) retained an attorney to investigate and represent the board at the
hearing  to inquire into Baldi's fitness to practice law.

Attorney John Wall, retained to investigate the character of Baldi also represented the
BBE at the June 29th hearing and   conducted cross  examination of Baldi. In this capacity he
was performing a prosecutorial function and qualifies for immunity.

Finally,  Baldi's 42 U.S.C. § 1983 claim, in Count X, against Attorney Wall for
allegedly reporting untruthful facts to the BBE regarding his character must fail because
"defamation, by itself is a tort actionable under the laws of most states, but not a constitutional
deprivation." Siegert v. Gilley, 500 U.S. 226 , 111 S. Ct. 1789, ll4 L.Ed. 2d 277 (1991).  In
Siegert, the Supreme Court held that a former government employee failed to make out a
violation of any constitutional right when he alleged that his former supervisor  wrote a
defamatory job performance  with malice.   Id at 226. Remedies   for tort injuries must be
brought in state court under traditional tort law principles.  Baker v. McCollan, 443 U.S. 137,
146 99 S.Ct. 2689, 114 L.Ed. 2d (1979).  This rule applies even when the alleged wrong has
been committed by an official acting under color of state law. Schiller v. Strangis, 540 F. Supp.
605, 616 (D. Mass. 1982).

Accordingly, because the defendants' actions in withholding Baldi's bar application,
pending an investigation of his fitness and character, were rooted in their capacity as judicial
quasi- judicial and prosecutorial officers, and within the scope of their appointed powers, the
plaintiff's claim for attorney fees pursuant to 42 U.S.C. § 1988 should fail.

**Conclusion**

For the reasons stated above, the BBE respectfully requests that this Court dismiss

Baldi's complaint for failure to state a claim under Fed. R. Civ. P. 12(b)6.

Respectfully submitted,
Edward Barshak, Alice Richmond,
Robert Muldoon, Jr., Anthony Massimiano,
William Kennedy, III, Margaret Marshall, John
Wall

By its attorney,
THOMAS F. REILLY, ATTORNEY GENERAL

/s/   Teresa Walsh, Assistant Attorney General
Government Bureau/Trial Division
One Ashburton Place, 18th Floor
Boston, Massachusetts,  02108
(617) 727-2200 ext. 3335
B.B.O.  550047

March 11, 2005

12

## REPORT OF THE BOARD OF BAR EXAMINERS RECOMMENDING
## AGAINST ADMISSION OF THE APPLICANT TO THE BAR

**Application for Admission to the
Bar by John A. Baldi**

**Civil No. 159224**

The applicant received a passing grade of 270 after taking the July 2003 bar examination. He had previously taken the February 2003 bar examination and failed. On November 3, 2003, he was notified that: "Based on information contained in your application, the Board of Bar Examiners requires that you come in for an interview. The interview will pertain to your answers in the Applicant's Statement to the Board of Bar Examiners." On November 18, 2003, the Applicant was interviewed by members of the Board. He was informed at the interview that the Board would obtain counsel to conduct an investigation, as there was sufficient material in his application to warrant an investigation.

The Board obtained as its _pro bono_ counsel John Wall, Esquire, a prominent criminal trial attorney and former assistant U.S. attorney in Boston. As a result of his full investigation, on May 6, 2004, he submitted a report containing over 50 attached exhibits which was marked as Exhibit C at the hearing on June 29, 2004. (Tr. p. 6)

In response to a letter from the applicant dated December 30, 2003, _pro bono_ counsel wrote to the applicant on January 5, 2004: "There is no 'accuser' nor 'source of the accusation' as alleged by you in your phone call to my secretary on the Morning of January 5, 2004; nor in fact is there any accusation nor any secret witness being hidden

from you, if that is what you are thinking.  As stated above, this entire investigation is based on <u>your</u> past and continuing submissions and where they lead and what they divulge as to your character."  The letter also stated:  "It is my understanding that you were so advised when you were interviewed by the Board of Bar Examiners."

In January, 2004, the applicant procured from the United States District Court for the District of New Hampshire in Civil Action No. 02-313-M, entitled *John A. Baldi v. Amadon, et al.* an *Ex Parte* order for a deposition of Mr. Barshak, to be taken in New Hampshire.  The *Amadon* case involved complaints by the applicant against several New Hampshire officials arising out of an incident in which the applicant allegedly placed and left on the highway the carcass of a deer he had shot.  At the hearing of the Board on June 29, 2004 when the applicant was asked the basis for seeking Mr. Barshak's deposition, the following testimony took place (Tr. p. 100 - 104):

"CHAIRMAN BARSHAK:  I don't know what you summoned me for.  The basis as I understand it is your contention that I was a close associate of somebody; am I right?

THE WITNESS:  That you know Jack Middleton, yes.

CHAIRMAN BARSHAK:  Jack Middleton?

THE WITNESS:  Yes, Secretary of the American Bar Association.  His term just expired.

CHAIRMAN BARSHAK:  What is the basis of your assertion that I am a close associate of him?

WITNESS:  I don't know if I said close associate.  I don't understand  how a Board of Bar Examiners could not be in association with the American Bar Association.

MS. RICHMOND:  To follow-up, when you say you don't understand how the Board of

Bar Examiners could not be in close association with the American Bar Association,

exactly what do you mean by that?

THE WITNESS:  All of the bar exams go through the ABA.

MS. RICHMOND:  None of the bar exams go through the ABA.

THE WITNESS:  The ABA has no role in it?

MS. RICHMOND:  Correct, except to accredit law schools.

THE WITNESS:  If I was in error on that then, I was in error.

MS. RICHMOND:  Your statement to Mr. Barshak was based on no facts that you had,

by (sic.) only what appears now to be an incorrect assumption about the role of the

American Bar Association?

THE WITNESS:  I find it very difficult to believe that the Board of Bar Examiners of a

state has no association with the American Bar Association.

MR. MULDOON:  We will tell you in fact no, nor is it a requirement.  There is

absolutely no basis for making an assumption like that, sir.

THE WITNESS:  Then I am in error.

MR. MULDOON:  What diligence did you do in terms of determining whether or not

Mr. Barshak is a member of the American Bar Association?  Please answer the question.

THE WITNESS:  I will.

MR. MULDOON:  Yes or no; did you determine whether or not he was a member?

THE WITNESS:  I didn't even look at whether he himself was or wasn't.

MR. MULDOON:  Please answer the question.  Did you do anything to determine

whether Mr. Barshak was ever a member of the American Bar Association?

THE WITNESS:  No, I did not.

MR. MULDOON:  That is the entire basis of your claim to subpoena him, the assumption there was a connection.

THE WITNESS:  No, that is not what I subpoenaed him on.

MR. MULDOON:  Excuse me.  You made a statement that he had an association with an unknown person now identified as a Mr. Middleton, and the association is based on the fact that Mr. Middleton is the former Secretary of the American Bar Association and, therefore, you concluded that Mr. Barshak had an association with him; is that correct?

THE WITNESS:  No.

MR. MULDOON:  On what basis other than that did you conclude an association or even acquaintance?

THE WITNESS:  The State of New Hampshire is diligently working to keep me from becoming an attorney.  That was the whole purpose of their prosecution of me for the incidents that happened with the Epson Police.  Because they found out that I had applied to and got accepted to law school.  That was their whole effort.

I had asked this Board to tell me why I was not being granted a hearing on my application.  This Board was denying me a hearing.  And I was patient.  I was asking for it.  I went to the clerks and asked.  And the clerk kept telling me to wait a couple more weeks.  The clerk told me, she said, 'I have been here 8 years and I have never seen them do this to anyone before.'  So there came a time when nothing was going to happen unless I did something.  And so the only thing I could think of as to why this Board would be doing that to me, was if Middleton got to this Board through his position as the Secretary of the American Bar Association.  And I figured that if someone from the

Board was in contact with the ABA, it would be the chairman.  That is how I came to that conclusion.  I did not subpoena him because of Jack Middleton.  If you look at my requests --

MR. MULDOON:  You have answered the question.  That's all I have.  Thank you."

At the close of his testimony, the applicant expanded his testimony beyond anything relevant, as follows: (Tr. p. 114 – 118)

"MR. BALDI:  One more thing.  If you have any doubts as to my allegations as to the criminal acts being committed by Jack Middleton, I have the affidavits -- excuse me, a deposition and I have told Mr. Wall that, from the Secretary of Blue Mountain that Jack Middleton is their attorney and he does know they were giving out the gifts.  And I have copies of the statutes making it illegal.  I have his statement as to Governor Weld and other Massachusetts officials going there and taking the bribes as well as other officials and who the real estate developer [deleted] is who was distributing the bribes.  So that is not fictitious what I was dreaming up about Jack Middleton.

And, again, I would reiterate to you, you would have to understand the whole aspect of what has been going on in New Hampshire for decades.  Blue Mountain is 24,000 acres that is fenced off and private and has a restaurant and has cabins and boards horses and stuff there.  It is 27 wealthy business men from around the country are the owners.

They finagled a way to get it called a nonprofit organization.  They use the facility for bribes and to get what they need from various officials.  [deleted] flies in ladies from around the country to accommodate various gentlemen there and stuff.  You may have read in the newspaper about an individual being killed there in a hunting accident.

Because while they were entertaining some Italian business men who were there.  There's a lot of things going on there.

Now, [deleted] who is related to Jack Middleton, he was the Newport District Court Judge.  [deleted] was appointed to the bench in 1978.  What he was doing -- because a district court judge at that time could still represent clients -- so he would solicit people who were inheriting an estate, tell them I will probate it for you, go before [deleted], who was a superior court judge in Sullivan County, probate the estate, get all the proceeds from the estate, and then wouldn't give it to you.  He would keep it himself.  And they documented approximately $3M he took from 1978 to 1990 that way.

I have all the testimonies before the house committee that investigated.  The attorney general's office knew what was going on and they chose not to take any action against it because he was a state official and that [deleted], who is a superior court judge, testified at the hearings that they had a policy of not prosecuting state officials.

Now, [deleted] also happened to be a pedophile.  And if you are a juvenile offender coming into his courtroom, he offers you a chance to come to chambers for some sexual satisfaction for a return of a not guilty finding.  And on two separate occasions he actually raped a juvenile offender in his chambers in the presence of a state police officer.  And the state police officer reported it and the attorney general's office chose not to prosecute or do anything about it.

What happened was in 1990 one of the people who had been deprived of what they were supposed to inherit started barking to the FBI in Boston.  And so at that time the States of New Hampshire saw the writing was on the wall and they were going to get caught.  So they brought out an indictment against [deleted].

6

When the FBI called they said they were going over to arrest him at the Newport District Court and they took some New Hampshire State Police Officers with them to the Newport District Court.  They got there and missed him by an hour.  And from 1990 to 1994 they could not find him.

But [deleted] had gone to Quebec and was hiding in Quebec.  And he has a diary and other documents that the board got that he was still staying in contact with his wife and other people in the state, including public officials and on occasion going out to dinner with the same people that are supposedly looking for him.

In 1994 somebody dropped a dime to the FBI that he was in Quebec and they went to Quebec and again missed him by a couple of hours.  I believe it was the very next day, but it was within a short period of time that he was found dead in a hotel room (sic) Las Vegas with a plastic bag over his head.  The coroner who did the autopsies called it a homicide.

There was a judicial convention going on in Las Vegas and the Nevada police got the body identified by a New Hampshire judge who was at that convention.  The Director of Public Safety for the State of New Hampshire sent three state police officers to Nevada to talk to the coroner.  And they convinced the coroner to call it a suicide rather than a homicide and then cremated the body and the body was brought back.

Now [deleted], in the New Hampshire House of Representatives, has actually spoken with this coroner and that coroner is perfectly willing if someone wants to go after it  And she has told him that she was really strong armed by those state police officers into calling that a suicide and not a homicide.  And when you get into all the documents and what was going on, it inculpates a whole variety of high ranking state

officials, which I am sure this Board -- this is not a facetious thing and that is part of what state (sic) the was afraid I was getting too much of.

CHAIRMAN BARSHAK:  Take it under advisement.

MR. MULDOON:  Thank you."

The applicant filed a Petition for Writ of Mandamus or Injunctive Relief (dismissed by the court (Sosman, J.) on June 27, 2003) which sought an order requiring the Board to review and rescore his answers to two of the essay questions on the examination, based on his contention that one question "had a sequencing or grammatical error" and because the answer on another question "was not given sufficient credit."

When the applicant filed a further petition for relief, which was denied by the Chief Justice, on January 7, 2004 he wrote to Assistant Clerk Andruszkiewicz referring to the ruling of the Chief Justice, as follows:  "It has become obvious that the Court is prostituting themselves to the unjustified actions of the Board and its chairman.  As long as they have predetermined that they will not admit me I have little choice but to pursue a federal remedy to prevent this from happening to others.  It is my opinion that the board is composed of a group of cowards and people of despicable character as they are not even willing to identify the fictional problem in my character.  Barshak is engaged in a deliberate attempt to try and intimate me and I do not yield to intimation , his or the Court's."

He added at the end of his letter:  "You can tell the Chief Justice and the rest of the Court that I believe they are a disgrace to the robe, and that individuals like them are what promote and credence (sic) to the actions of people like those involved in the Waco Texas and Ruby Ridge tragedies."

In early 2004, the applicant brought an action in the federal court against members of the Board and members of the Court.  It was subsequently dismissed.  While it was pending, the applicant sought to procure answers to interrogatories by the defendants in that case.  On March 10, 2004 he wrote a letter to the Assistant Attorney General of the Commonwealth who was representing the defendants as follows:  "You should also be aware that Alice Richmond's defamation by slander of my good name is not a part of her duties as a member of the Board of Bar Examiners and the Quasi Judicial immunity extended to board members does not apply to defamation.  When the present matter is concluded I will be filing a claim for damages against Ms. Richmond."

The conduct of the applicant demonstrates his characteristic impetuous recklessness both in making accusations and in using court processes.

## <u>CONCLUSION</u>

Based upon the above statement of facts, the Board recommends that the applicant not be admitted as a member of the bar of this Court.

Board of Bar Examiners by:


_____
Edward J. Barshak, Chairman


359533

9